**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPHINE A. MCQUAIL, PH.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:13-0061** |
| | ) | |
| **TENNESSEE TECHNOLOGICAL** | ) | |
| **UNIVERSITY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

This is an employment discrimination action brought by Dr. Josephine A. McQuail, a full-time professor in the English Department of the College of Arts and Sciences at Tennessee Technical University ("TTU"). Defendants have filed a Motion for Summary Judgment (Docket No. 29) with supporting Memorandum (Docket No. 30), to which Plaintiff has responded in opposition (Docket No. 37). For the reasons that follow, Defendants' Motion will be granted and this case will be dismissed.

**I. Factual Background**[1]

Plaintiff was hired by TTU as a tenure-track Assistant Professor in 1990. She became tenured in 1995, when she was also promoted to Associate Professor. In 2001, she was promoted to full professor.

In 2002, Plaintiff's colleague, Dr. Kurt Eisen, was named English Department chair. In July

---

[1] The facts are based upon Defendant Statement of Undisputed Facts, Plaintiff's responses thereto, and this Court's thorough review of the entire record. These facts will be expanded upon where necessary when the Court discusses Plaintiff's specific claims.

1

2007, he was named interim Associate Dean of TTU's College of Arts and Sciences.

## A. *Appointment of an Associate Dean*

On May 3, 2011, Dr. Paul Semmes, Dean of Arts and Sciences, requested permission from the Administration to conduct an internal search for a permanent Associate Dean. The request was approved by TTU's Provost, TTU's President, and the Tennessee Board of Regents.

Subsequently, a proposed search committee consisting of a member from each of the departments in the College of Arts and Sciences was submitted to TTU's Office of Diversity and Legal Affairs for approval of its composition. By email dated August 23, 2011, its Director, Rachel Rader, informed Dean Semmes that the search committee met the Board of Regents' requirements for diversity.[2] The search committee, as approved, consisted of ten members: seven males and three females.

The search committee prepared a proposed notice that described the position of Associate Dean, its job requirements, and the required and preferred qualifications. After the notice was reviewed by Ms. Rader (and perhaps others), it was posted on TTU's website. Notice was also placed in the Tech Times, an online faculty newsletter.

Only two individuals applied for the position – Plaintiff and Dr. Eisen. They did so by uploading their applications onto TTU's PeopleAdmin system, together with their curriculum vitae, and the names and email addresses of three references.[3] The search committee scheduled interviews

---

[2] In her deposition in this case, Ms. Rader testified that the Board of Regents' policy is that search committees should be diverse in terms of their racial and sexual composition, but there are no guidelines which specify percentages. She also testified that she generally looks at the names of those proposed and usually knows the race of each individual and whether they are male or female. She did not recall ever rejecting a proposed search committee submitted to her office on the basis that it was not diverse.

[3] In her deposition, Plaintiff stated that she submitted four references and four recommendation letters because she was concerned that one of the letters might not be received on time.

for the two candidates in November 2011.

History Professor Wali Kharif was the chair of the search committee and he prepared a schedule of interviews for the two candidates. In an email, dated November 11, 2011, announcing the interview schedules, Dr. Kharif identified the two candidates in the first paragraph by their full academic titles and names, *i.e.* "Dr. Kurt Eisen" and "Dr. Josephine McQuail." In the headings over Dr. Eisen's schedule, Dr. Kharif again identified him by his full title, but, in the heading over Plaintiff's schedule, Dr. Kharif referred to her simply as "Josie McQuail."[4] On the days of their respective interviews, each candidate met with Associate Provost Sharon Huo, Dean Semmes, the department chairs, the search committee, and the faculty of the College of Arts and Sciences (where each candidate made a presentation).

Following the interviews, the search committee received anonymous evaluation sheets from the approximately ten faculty members who attended each candidate's presentation. These evaluations requested the responder to list the candidate's strengths and weaknesses, to state "yes" or "no" as to whether the candidate was acceptable and, if acceptable, to rank the level of acceptability from 5 ("strong") to 1 ("weak").

Four faculty members, including one chair, voted Plaintiff "acceptable," while five faculty members, including two chairs, voted Plaintiff "not acceptable". In contrast, nine faculty members (including all 5 chairs) found Dr. Eisen "acceptable" while two deemed him "not acceptable". Breaking it down further, the overall level of Plaintiff's acceptability by the faculty members who

---

[4] This was brought to Dr. Karif's attention by Dr. Kevin Christianson, another professor in the English Department. Dr. Karif then called Plaintiff, apologized, and told her it would be corrected.

voted was 2.1, while the overall acceptability of Dr. Eisen was 4.6.[5]  Among the reasons cited for

the preference of Dr. Eisen over Plaintiff was his more than four years' service as Interim Associate

Dean.

The Search Committee recommended that Dr. Eisen be appointed Associate Dean.  That

recommendation was approved by TTU's Human Resources, the Interim Provost, and the University

President.

**B.  St. Gallen, London, Bonnaroo and Beyond**

TTU has a fund that provides up to $1,000 during a given 24-month period for tenured

faculty development.   In November 2010, Plaintiff attended a several day event in St. Gallen,

Switzerland.  Plaintiff was given (or reimbursed) $2,273.39 by TTU for the trip, including $1,000

from the faculty development fund, to attend.

On November 18, 2010, Plaintiff requested funding to attend the 25th Anniversary of the

Blake Society[6] scheduled to be held on November 28, 2010, in London, England.   In an

accompanying memo, Plaintiff indicated that the potential costs and expenses would be $1,663.60,

but that she would accept partial funding.  Plaintiff's request was denied.   Associate Provost Mark

A. Stephens wrote Plaintiff, explaining that the "funding request was denied at all levels," and that

his office denied the request "because in order to receive funding through the university faculty

---

[5] These figures are drawn from Defendants Statement of Undisputed Facts.  Plaintiff "disputes" these facts because she claims neither her deposition, nor the exhibits attached thereto, list the averages.  However, the average is based upon a simple mathematical calculation of the numbers set forth on the Candidate Evaluation Forms which were attached as exhibits to Plaintiff's deposition.  Moreover, Docket No. 32-2 at 46 & 47 contain these figures as a part of the summary of qualifications of the candidates, and appear to be part of collective Exhibit 15 from Plaintiff's deposition.

[6] "The Blake Society honours and celebrates William Blake (1757-1827), engraver, poet, painter & prophet."  http://www.blakesociety.org (lasted visited November 13, 2014).

development fund your department and college must first provide support for your trip and that was not provided." (Docket No. 32-2 at 8). That email also indicated that Plaintiff had previously received money for the trip to Switzerland.[7] She had also been reimbursed $350 (albeit not from the faculty development fund) for a trip to Montreal, Canada earlier that same year.

In July 2011, TTU's media webpage displayed a photograph of Mr. Mark Creter, a Professor in the English Department, and Mr. Andrew Smith, an instructor in that department, attending Bonnaroo.[8] Discovery of the photographs led to an imbroglio over funding, countless emails between faculty members, and ultimately an investigation – all over the use of a van, and a few hundred dollars in rental fees.

On June 7, 2011, Dr. Christianson wrote Dean Semmes, Plaintiff, and two others stating that he had just seen the photograph and positing several questions, including whether Mr. Creter's and Mr. Smith's attendance at Bonnaroo was sponsored by TTU, whether their activities related to the academic programs and educational mission of TTU, and what amount of funds had they been given to attend Bonnaroo each year. Plaintiff joined in the discussion that same day by sending an email sharing many of the same concerns, questioning the source of the funding, and pointing out that she received no funding to go to the Blake Society event. In the ensuing month, a flurry of emails was

_____

[7] In his deposition, Dr. Stephens explained that faculty development funds can be used by both tenured and non-tenured faculty members and that he, therefore, gets requests from all over campus. He also explained that most faculty members will apply for one trip a year, while some apply for two or even three. A lot depends upon the location of the event, since international travel is much more expensive.

Normally, to receive monies from the development fund, a faculty member's department must contribute some funding for the trip. Dr. Stephens stated that he has allocated anywhere from $150 for a trip, to well over a thousand dollars.

[8] Bonnaro is a four-day outdoor festival held yearly at a farm in Manchester, Tennessee. See http:///www.bonnaroo.com.

exchanged and the recipient list grew exponentially.

Dr. Semmes sent out a widely distributed email setting a July 25, 2011 meeting date to discuss the matter with the English and Communications faculty. Apparently, the air was not cleared at that meeting.

On July 27, 2011, Plaintiff sent an email (also widely distributed) that, in pertinent part, stated:

> These issues are NOT "trivial"; they concern liability issues, misuse of state property; improper use of taxpayer money, which is why some in the department are concerned. No one deliberately set out to do anything wrong, but just as students who say "I don't know that was plagiarism" are not exempt from being guilty of it, so too someone who has committed "fraud" (which is what some of this is) is still guilty of it, and it is a felony in the state of Tennessee to misuse state property. Public perception of us as faculty members who represent the university is also a concern of some in the department.

(Id. at 62).[9]

On August 17, 2011, Mr. Creter sent Dean Semmes an email that stated, in part:

> I am officially filing a complaint against my colleagues, Dr. Kevin Christiansen and Josie McQuail. Over the last few weeks they have engaged in a campaign of attacks and innuendo through e-mails both to my fellow colleagues and my superiors in the administration. These e-mails have attacked my work, my integrity and my reputation. They have made no attempt to contact me in any collegial way while continuing to attack me behind my back. . . . Please let me know how I should proceed with this complaint.

(Id. at 75). Upon receipt, Dean Semmes emailed Provost Stephens who responded that Mr. Creter could file a "matter of concern" pursuant to the TTU's personnel policy, or he could file a "matter of concern" with the Faculty Affairs Committee of the University Senate.

---

[9] This email was sent shortly after William Fisk, an Instructor in the English Department, emailed Plaintiff and others stating that he had "been following this tempest in a teapot since the beginning" and "was astounded at the amount of effort, time, and just downright pettiness surrounding this 'issue.'" (Id.)

Mr. Creter opted for filing a complaint with the Faculty Affairs Committee.[10]  On December 23, 2011, Dr. Brian M. O'Connor, chair of that committee, sent a letter to Plaintiff, Dr. Christiansen, and Mr. Creter.  Dr. O'Connor did not mince words.  He informed them the Committee had found that a valid grievance existed, but not to the extent stated.  He observed that "raising the issue of funding a University van for Mr. Creter's travel to the  Bonnaro festival was a perfectly valid question" and protected whistle blowing activity, but that "once a thorough investigation of the issues had been conducted, the whistle needed to stop blowing."  (Id. at 80).  Dr. O'Connor continued:

> The Committee also thinks that the administration, beginning with the Interim Chairperson of the Department of English and Communications did not do enough to ensure that the issue was put to rest.  The meeting that took place on July 27, 2011 was supposed to be a discussion of the matter with all interested parties.  Only seven people came, however, and Dr. Christianson chose not to attend.  More diligent effort should have been followed in an attempt to find a solution.

> The Committee further believes that the problems indicated in the complaint by Mr. Creter are a symptom of an atmosphere in the Department of English and Communications that is at best unproductive and at worst hostile.

(Id.).

Dr. O'Connor, on behalf of the committee, also took umbrage with the tone of the emails that had been circulated and observed that Mr. Creter, too, had "contributed to the rancor" in his emails.  (Id.).  He concluded by urging Dr. Christianson and Mr. Creter to "attempt to find a mutually acceptable resolution in keeping with University policies and generally accepted professional

---

[10] In response to Defendant's Statement of Facts, Plaintiff asserts that, prior to filing his complaint, Mr. Creter had a brief informal meeting with Associate Dean Eisen who spoke with him more as a friend than as a Dean and who discouraged him from filing a complaint.  Plaintiff cites Mr. Creter's deposition testimony for these statements but the pages containing those statements do not appear to have been filed as a part of the record.  Nevertheless, the Court accepts Plaintiff's representation, even though it does not understand how counseling Mr. Creter not to file a complaint helps Plaintiff's position.

principles," and noted that the dispute could "be ameliorated by individuals acting in a mature and collegial manner." (Id. at 81). He requested that they file a progress report by February 1, 2012.

In May 2012, the internal audit was completed. The accompanying report indicated that, while Mr. Creter and Mr. Smith had attended Bonnaro each year from 2007 to 2011, a TTU van was utilized to transport employees and others to the festival only the last two years. For the 2010 trip, the cost of the van rental was $148.00 and charged by Mr. Creter to a theater account. The cost of the 2011 van rental was also slated to be paid for by the theater account but Dean Eisen, based upon his understanding of the purpose of the trip, charged the $230.40 van rental expense to the Mitchum Endowment fund which allow for funds to be used for "events or community building activities that directly involve students (*e.g.* receptions, readings, award luncheons, travel to culturally significant sites or event)[.]" (Id. at 70). A couple of weeks later, however, Dean Semmes and Associate Dean Eisen determined that the Arts and Sciences Endowment Fund which allows the use of funds at the Dean's discretion for "enrichment activities" was a better fit and so the funds were paid out of that account.[11]

The report concluded that Mr. Creter and Mr. Smith had tacit departmental approval to travel in-state because the Interim Chair considered the trip to be within the purview of the theater's mission. However, no specific pre-approval was sought as required by Board of Regents' guidelines. The report recommended that the Business Office review its procedures regarding the rental of TTU vehicles; that faculty be further educated about the travel policy; and that, consistent with the handling of the 2010 van rental expense, the $148.00 in van rental expense for the 2010 trip

---

[11] The report also found that three rubber balls and an extension cord belonging to TTU were taken on the trip, but not property checked-out. Those items, however, were returned.

be transferred to the Arts and Sciences Endowment Fund.

On a matter unrelated to that which has been reviewed so far, but which ultimately segues back to Bonnaroo, Plaintiff claims that about one year into her tenure as President of the American Association of University Professors ("AAUP") she contacted Dr. Patrick Reagan, a TTU history professor and webmaster for AAUP's local chapter, asking him to update the webpage. When he did not do so, and stopped responding to her emails, Plaintiff emailed him and informed him that she had updated the website with minutes and agendas for the past year, and had added photographs from the state conference meeting. This prompted a blistering response email from Dr. Reagan dated August 16, 2011, in which he (1) chastised Plaintiff for accessing and updating the website, (2) stated that her "continued use for personal issues . . . of AAUP's name credibility and reputation . . . is unethical [and] unprofessional," and (3) claimed that Plaintiff's "high-handed misuse of authority as president . . . ha[d] nearly single-handedly destroyed our [the local chapter's] professional good name." (Id. at 83).

Two days later, Plaintiff sent an email to Deans Semmes and Eisen in which she reported that she was being retaliated against because, when she weighed in on the potential misuse of funds for the Bonnaroo trip, Mr. Creter and Mr. Smith were informed about it. She also claimed that the email sent by Dr. Reagan was "partially motivated by retaliation for my role in questioning improper use of state property." (Id. at 86). She further wrote that, without notice, her name had been removed from the program for the upcoming open faculty meeting, depriving her of the opportunity to address the crowd as a representative of AAUP. She also claimed that her role as leader and her character had been "maligned" as a result of "vicious gossip" simply because she had raised "valid question about inappropriate use of state funds and state property." (Id. at 84).

That same day, August 23, 2011, Provost Stephens emailed Plaintiff telling her that TTU does not retaliate. As for the presentation at the faculty meeting, Provost Stephens stated that both she and Ray Jordan of the Tennessee Education Association ("TEA") had been taken off the agenda because he did not know who would be representing their respective organizations, and because the program would be recognizing more than double the number of faculty members than it did the year before. Nevertheless, and given that both AAUP and TEA traditionally addressed the faculty at the open faculty meeting, Plaintiff was re-invited to make her presentation, as was a representative of TEA.

Advancing to this year, Plaintiff forwarded Dean Semmes a series of emails from three male colleagues, two of which she viewed as unprofessional communications and one of which she viewed as showing gender bias. Dr. Semmes thanked her for sharing her concerns and told her that he had notified Human Resources. On May 4, 2014, Plaintiff emailed Dean Semmes again, noting that she had not heard from Human Resources, stating that she felt she was being attacked because of her gender, and asking whether the complaints had been reported to an affirmative action officer. The next day, Dean Semmes responded by email stating that, when he received the forwarded emails, he viewed them as complaints about a lack of professionalism rather than sex discrimination complaints and that upon further review he realized that they should have been referred to the Director of Diversity and Legal Affairs. Accordingly, he forwarded the emails to Ms. Rader.

## C. Charge and Amended Complaint

Plaintiff filed a Charge of Discrimination with the Tennessee Human Rights Commission ("THRC") on July 18, 2012, checking the boxes for discrimination based on "sex" and "continuing violation." She listed the earliest date of discrimination as October 13, 2011 and the latest date as

March 28, 2012.

On January 13, 2013, Plaintiff filed a three-count Amended Complaint in this Court. Count One alleges discrimination and harassment in violations of Title VII, 42 U.S.C. § 2000e *et seq.*; Count Two alleges violations of 42 U.S.C. § 1983; and Count Three alleges retaliation in violation of Title VII.[12]

## II. <u>APPLICATION OF LAW</u>

### A. *Title VII Claims*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Within its purview are claims for gender discrimination, retaliation, and harassment like Plaintiff alleges here.

Plaintiff offers no direct evidence of discrimination in relation to any of her claims and hence the Court utilizes the burden shifting paradigm established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973) for both her gender discrimination and retaliation claims. Under this framework, a plaintiff is first required to establish a *prima facie* case of discrimination (or retaliation) and, if he or she does so, a presumption of discrimination (or retaliation) arises, with the burden of production shifting to defendant to articulate some legitimate, nondiscriminatory reason for its action. <u>See</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506-07 (1993). If the defendant articulates such a reason, the presumption drops from the case, and the plaintiff is then provided the opportunity to

---

[12] In response to Defendants' Motion to Dismiss (Docket No. 24), Plaintiff conceded that she could not recover monetary damages from either President Oldham or Dean Semmes under 42 U.S.C. §1983, and that the latter could not be held individually liable under Title VII. Accordingly, those claims were dismissed by Order of this Court (Docket No. 40) on September 16, 2014.

show that the reason offered by the defendant is but a pretext for discrimination.  See, id. at 508.

### 1.  Gender Based Discrimination and Failure to Promote

Plaintiff's gender discrimination claim is grounded primarily on Defendantss failure to promote her to the position of Associate Dean.   To establish a *prima facie* case of gender discrimination in the failure to promote context, Plaintiff must show: "(1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the same time her request for promotion was denied." Warf v. U.S. Dept. of Veterans Affairs, 713 F.3d 874, 879 (6th Cir. 2013) (citing  Nguyen v. City of Cleveland, 229 F.3d 559, 562-63 (6th Cir. 2000)).

"In a failure to promote claim, the emphasis in the fourth element is on the relative qualifications of the plaintiff and the employee who actually received the promotion."  Prvenzano v. LCI Holdings, Inc., 663 F.3d 806, 814 (6th Cir. 2011).  Further, because "[t]he prima facie burden is not intended to be onerous," a plaintiff need not only  show she "possesses 'similar qualifications' to the employee who received the promotion."  Id.

Even under the relaxed standard for establishing a *prima facie* case, the Court cannot conclude that Plaintiff was similar to Dr. Eisen given the latter's administrative experience during his four years as interim Associate Dean, and his five years as chair of the English Department.  This remains so notwithstanding Plaintiff's assertion in her response brief that she (1) "was as qualified if not more qualified" than Dr. Eisen ; (2) "successfully fulfilled her job duties with Defendants and excelled above and beyond her male counterpart"; and (3) "was the superior candidate" because "she promoted [TTU] through organizations such as AAUP and NeMLA," serving as executive director

of the latter from 2003-2006. (Docket No. 37 at 19).[13] Plaintiff's "subjective view of her qualifications in relation to those of the other applicants, without more, cannot sustain a claim of discrimination." Hedrick v. Wester Reserve Care Sys., 355 F.3d 444, 461 (6th Cir. 2004); accord, Rachells v. Cingular Wireless Emp. Serv., LLC, 732 F.3d 652, 664 (6th Cir. 2013).

Regardless, and assuming Plaintiff was similarly qualified, TTU has articulated a legitimate non-discriminatory reasons for its decision – Dr. Eisen was more qualified because he had served for several years as interim Associate Dean. See Hawkins v . Memphis Light Gas & Water, 520 F. App'x 316, 319 (6th Cir. 2013) (collecting cases) ("Selecting a more qualified candidate constitutes a legitimate, non-discriminatory reason."). Moreover, faculty members who attended the presentations by both candidates favored him by a wide margin.

Because Defendants have offered legitimate, non-discriminatory reasons for the selection of Dr. Eisen, Plaintiff must forward some evidence that TTU's decision was a pretext for discrimination. She has not done so.

In her response brief, Plaintiff argues that TTU "purposely places males—in this case, Dr. Eisen—in a position where they ultimately gain administrative experience, so that females—in this case, the Plaintiff—could not possibly compete on an administrative level." (Docket No. 37 at 19).

---

[13] According to Plaintiff's response brief, NeMLA is an acronym for Northeast Modern Language Association and "is part of a premier professional organization that includes in its demography, Ivy League schools, various northeastern colleges and universities and Canadian institutions." (Id. at 2). Plaintiff also claims that when she served as that body's Executive Director "she had full responsibility for everything, including the conference, the annual budget, travel and accommodation arrangements for the conference." (Id.). Defendants discounts the importance of Plaintiff's role as Executive Director, arguing that the organization has "no staff, no offices" and its "sole activity" is the annual conference. (Docket No. 30 at 11).

If Plaintiff believed that her participation in NeMLA (and, for that matter, her "administrative experience" as "Director of the Associated Students of the University of California Berkeley recycling project" (Docket No. 37 at 2)) was important in deciding Defendants' Motion for Summary Judgment, it was incumbent upon her to file a statement of additional material facts in accordance with Local Rule 56.1(c), so that Defendants could respond to those facts.

But Dr. Eisen's appointment to the interim slot occurred years before, and Title VII requires that administrative charges be filed with 300 days of the discriminatory act in deferral states like Tennessee. See 42 U.S.C. §2000e-5(e).

Plaintiff's invocation of the continuing violation doctrine to equitably toll the 300-day filing requirement goes nowhere. While she referred to "male grooming" and the "shoo-in system" at TTU during her deposition, and while she notes that Dr. Semmes became Dean after first being an interim Associate Dean, this fact, even in conjunction with the appointment of Dr. Eisen from an interim position, does not "'show a longstanding and demonstrable policy of discrimination,'" Bowerman v. Int'l Union United Auto. Workers, 646 F.3d 360, 366 (6th Cir. 2011) (citation omitted), or "'a continuing over-arching policy of discrimination,'" Austion v. City of Clarksville, 244 F. App'x 639, 647 (6th Cir. 2007) (citation omitted).

Apart from her failure to promote claim, Plaintiff asserts she was subjected to gender-based discrimination in other ways. She does so, however, in a scatter-shot way, with some of her assertions appearing in her "Statement of Facts" section (even though, as noted, she did not file a separate statement as required by Local Rule 56.01), and others appearing in her "Argument" section. The Court has reviewed all of those contentions and finds them insufficient to present a triable issue of fact. In this regard, the Court notes the following.

An essential element of a gender discrimination claim, which Plaintiff must prove, is that she was "'treated differently than similarly situated [employees of the opposite sex] for the same or similar conduct.'" Foster v. Country Fresh, LLC, 563 F. App'x 360, 361 (6th Cir. 2014) (quoting Humenny v. Genex Corp., 390 F.3d 901, 906 (6th Cir. 2004)). To do so, Plaintiff "must show that 'all relevant aspects' of her employment situation are 'nearly identical' to those of the alleged

similarly situated male employees." Humenny, 390 F.3d at 906 (quoting, Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp., 176 F.3d 921, 928 (6th Cir. 1999)). "Moreover, to be deemed 'similarly situated,' the individuals with whom [Plaintiff] compares herself 'must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Id. (quoting, Gray v. Toshiba Am. Consumer Products, Inc., 263 F.3d 595, 599 (6th Cir. 2001)).

Plaintiff asserts she was treated differently because of her gender when she was denied funding to go to London, and points to the fact that funding was provided for the van rentals in relation to Bonnaro. However, Plaintiff has not presented anything which remotely suggests that she and Mr. Creter and/or Mr. Smith were similar. Plaintiff had already exhausted her faculty development funds when she traveled to Switzerland a month before, and her request was denied based upon the policy that tenured faculty members were entitled to $1,000 in such funds during any 24-month period. The funding for the rental van was a *post hoc* decision (rightly or wrongly) to determine the source of funding for travel which the faculty members thought they had at least tacit approval.

Plaintiff also claims that "[a]nother example of gender bias and discrimination" is the "cronyism that exists among Eisen, Creter and Smith." In her brief, she writes:

> Many "off-the-record" conversations and meetings took place among them. Plaintiff describes this as "circling the wagons," which circled around Creter, in a personal, friendship defense, in a way that did not happen to protect Plaintiff. Another indication is their having socialized on occasions.

(Doc. No. 37 at 4). While Plaintiff cites her deposition testimony for these statements, she offers nothing further to support the allegations, and nothing which shows that she was subjected to

differing treatment because of the relationship between those individuals. The fact that cronyism may exist at TTU and that decisions may have been made based upon friendship does not alone show discrimination. See Quinn-Hunt v. Bennett Enters., Inc., 211 F. App'x 452, 458 (6th Cir. 2006) ("favoritism . . . is not evidence of impermissible discrimination"); Clark v. Cache Valley Elec. Co. 573 F. App'x 693, 697-98 (10th Cir. 2014) (collecting cases for the proposition that decisions motivated by friendship, cronyism, or nepotism do not constitute actionable discrimination); Barry v. Moran, 661 F.3d 696, 708 (1st Cir. 2011) ("employment decision motivated by cronyism, not discrimination, would be 'lawful, though perhaps unsavory'").

Plaintiff also claims that "[w]hen male faculty members achieved recognition for TTU, such as when TTU was featured on National Public Radio ["NPR"], Semmes provided wide distribution of the story that featured the University, but when Plaintiff informed Semmes of her accomplishments, he replied, "thanks for sharing, best regard." (Docket No. 37 at 26-7). Plaintiff argues the point no further, but earlier in the factual section of her brief she states that she presented a paper at the AAUP meeting in Washington, D.C. and an article thereafter appeared "in the premiere national publication dealing with higher education, The Chronicle of Higher Education[.]" (Id. at 7).

No doubt the Chronicle is an important source of information in the field of higher education, but Plaintiff has made absolutely no effort to explain how the feature on NPR was substantially similar to the reference made to her in the Chronicle. Moreover, the record reflects that the "wide distribution" of the NPR story was not the work of Dean Semmes. Rather, Linda Fisk, an administrative assistant in the English Department, forwarded an email she received from Dr. Homer

Kemp that included a link to the NPR story, and stated, "I thought the department might be interested in this national exposure for our college and department. Jack and Andy were interviewed and the crew toured our sites on campus." (Docket No. 32-2 at 90-91).

When a defendant files a properly supported Motion for Summary Judgment, the plaintiff must set forth specific fact showing that there is a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). Even "view[ing] the evidence and draw[ing] all reasonable inferences therefrom in the light most favorable to [plaintiff]," Little v. BP Exploration & Oil Co., 265 F.3d 357, 361 (6th Cir. 2001), the Court finds that Plaintiff has not presented from which a jury could find in her favor or her gender discrimination claim.

### 2. Retaliation

Retaliation claims, like those alleging discrimination may be established by either direct or circumstantial evidence, but, though similar, "[t]he elements of a retaliation claim are . . . distinct from those of a discrimination claim." Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014). "To establish a prima facie case of retaliation under Title VII, plaintiff must demonstrate that: "(1) [s]he engaged in activity protected by Title VII; (2) h[er] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." Id. With regard to the third element, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting

a charge of discrimination.'" Burlington No. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)

(quoting Rochon v. Gonzales, 338 F.3d 1211, 1219 (D.C. Cir. 2006).  As for the fourth element,

"Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,'

which 'requires proof that the unlawful retaliation would not have occurred in the absence of the

alleged wrongful action or actions of the employer.'" Laster, 746 F.3d at 731 (quoting Univ. of Tex.

Sw. Med. Ctr. v. Nassar, ___ U.S. ___, 133 S. Ct. 2517, 2533 (2013).

There is no dispute that Plaintiff engaged in protected activity by filing a Charge of

Discrimination with the THRC in July 2012, or by bringing this suit.  Nor is there any dispute that

TTU was aware of this protected activity.  What it disputed is whether she was subjected to a

materially adverse action because of her engagement in a protected activity.

In the argument section of her brief, Plaintiff baldly asserts that she "suffered many material

adverse actions, such as Defendant's [sic] denial of recognition for her accomplishments and its [sic]

public humiliation of her in front of the Faculty Senate,"  (Docket No. 37 at 23), but makes no

further effort to identify the allegedly retaliatory acts.  The factual section of her brief is hardly more

enlightening, but what the Court gleans is that she also views her removal from the open faculty

meeting and Dr. Reagan's e-mail as retaliatory.

Plaintiff does not even attempt to explain how the failure to send out an email (similar to the

one about the NPR story) is a materially adverse action, or how, even if it is, an email sent not by

Dean Semmes, but by an administrative assistant, is retaliatory for Plaintiff having filed an Charge

of Discrimination.  Dr. Regan's email is not retaliation for purposes of Title VII because the email

was a response, albeit untempered, to Plaintiff having messed with the webpage, not because she

filed a charge, (even assuming he knew of the protected activity).  And, leaving aside that

Defendants have offered a legitimate, non-discriminatory reason for Plaintiff's initial removal from the open faculty meeting, which Plaintiff has not shown to be pretextual, that action was not materially adverse because she was allowed to make her presentation, nor was the "but for" reason for the action retaliatory because the TEA representative, too, was also initially removed from the program.

Finally, as for the "administration publicly humiliating [Plaintiff] during an open Faculty Senate meeting," Plaintiff writes:

> O'Connor, as representative of the Faculty Senate, spoke about what had happened in the AAUP the year before. He described the Faculty Affairs Committee, and said there was a situation in the English Department that the Faculty Senate had handled. As Chair of the Committee, he had worked to resolve this dispute. They had just sat their new President, Oldham, and O'Connor said, "Now, be careful when you write a memo to Oldham, and don't leave a space between "Old" and "ham" or people will think you're referring to that old ham, Creter," alluding to Faculty Affairs' knowing that Creter was the Complainant.

(Docket No. 37 at 8).[14]  Clearly this does not give any indication as to how Dr. O'Connor's statements were retaliation against Plaintiff having filed a Charge when the reference was to President Oldham and Mr. Creter. Moreover, the reason that the Faculty Senate got involved in the morass surrounding the Bonnaroo trip was because Mr. Creter had filed a "matter of concern," not because Plaintiff had engaged in protected activity.

The Court recognizes, as the Supreme Court made clear in Burlington, that "context matters' for purposes of analyzing retaliation claims. But the Supreme Court also reiterated that "it is important to separate significant from trivial harms" because Title VII "does not set forth 'a general civility code for the American workplace.'" Burlington, 548 U.S. at 68 (quoting Oncale v.

_____

[14] The only elaboration on this in the cited portions of Plaintiff's deposition was that she did not find the comments either appropriate or funny.

Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998). "[P]etty slights, minor annoyances, and simple lack of good manners," id. are not within the purview of Title VII's anti-retaliation provisions.

### 3. Hostile Work Environment

Title VII prohibits, among other things, "the creation of a hostile work environment" on the basis of an employee's gender. Vance v. Ball State Univ., ___ U.S. ___, 133 S. Ct. 2434, 2441 (2013). To establish such a claim, Plaintiff must show that "'(1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.'" Waldo v. Consumers Energy Co., 726 F.3d 802, 813 (6th Cir. 2013) (quoting, Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th Cir. 2011)). "The touchstone of any hostile work environment claim . . . is whether 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Khamati v. Sec'y of Dept. of the Treasury 557 F. App'x 434, 442-43 (6th Cir. 2014) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 333 (6th Cir. 2008) (citing, Harris, 517 U.S. at 21-22). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively

regard the environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000). "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Clark v. United Parcel Serv., Inc., 400 F.3d 341, 352 (6th Cir. 2005) (quoting, Harris 510 U.S. at 23).

In her brief, Plaintiff claims that the following shows a hostile work environment: (1) Dr. Fisk called her "menopausal" at a time "in proximity to the Bonnaroo incident and its aftermath"; (2) during the meeting meant to clear the air, Mr. Creter "spoke of hula-hooping activities at Bonnaroo" and said "Josie, you could use some of that," "implying she was overweight"; (3) TTU administrators ignored Dr. Reagan's "extremely insulting and defamatory email"; (4) she was removed from the opportunity to speak at the open faculty meeting; (5) "her role as a leader [was] undermined and her character maligned because of malicious gossip inspired by her valid question about inappropriate use of state funds"; (6) during an AAUP event Mr. Smith interrupted a discussion and said "'Hello, Josie,' in a degrading manner, insinuating that any woman speaking with a man in authority was part of an insurrection movement led by Plaintiff"; (7) she was denied recognition for the paper she had presented at the AAUP meeting (in contrast to the treatment the NPR story received); and (8) she was "public humiliated during an open Faculty Senate meeting" when O'Connor addressed what had happened regarding the "situation in the English Department" and made the comment about not leaving "a space between 'Old' and 'ham[.]'" (Docket No. 37 at 6-7).

Although the inquiry into whether a environment is hostile is not subject to a "mathematically precise test," Harris, 510 U.S. at 22, and there is no bright line "'between a merely

unpleasant working environment . . . and a hostile or deeply repugnant one,'" McPherson v. City of Waukegan, 379 F.3d 430, 438 (7th Cir. 2004) (citation omitted), the Court finds that Plaintiff has wholly failed to show that the conduct of which she complains was sufficiently severe or pervasive so as to alter the terms and conditions of his employment.  See Primm v. Auction Broad. Co., LLC, 2012 WL 13930, at *8 (M.D. Tenn. Jan. 12, 2012) (collecting numerous cases and finding no hostile work environment where comments were not physically threatening, some were not directed at plaintiff's protected status, and there were no more than a handful of statements over a relatively short period of time).

It has been observed that the "severe and pervasive . . . standard 'protect[s] working women from the kind of male attentions that can make the workplace hellish for women.'"  Ocheltree v. Scollon Prod., Inc., 335 F.3d 325, 333 (4th Cir. 2003) (quoting, Bakersville v. Culligan Intern. Co., 50 F.3d 428, 430 (7th Cir. 1995)).  Although "hellish" may be too strong a word, the ongoing acrimony and internecine dispute among cliques in the English Department faculty at TTU is, unfortunately, an environment apparently shared by all.

### B.  42 U.S.C. § 1983

In Count Two, Plaintiff alleges that Dr. Oldham and Dr. Semmes "substantially deprived Plaintiff of her clearly established rights, privileges and immunities guaranteed her as a citizen of the United States by the First, Fourth and Fifteenth Amendments of the United States Constitution in violations of 42 U.S.C. §1983."  (Docket No. 20, Amended Complaint ¶ 66).[15]

---

[15] Presumably Plaintiff intended to state a claim under the Fourteenth Amendment, instead of the Fifteenth Amendment, because the latter prohibits federal and local governments from denying a citizen the right to vote "on account of race, color, or previous condition of servitude." U.S. CONST., amend. XV.  Also, presumably, Plaintiff intended to cite the Fifth Amendment rather than the Fourth Amendment because the former deals with due process, among other things, while the latter prohibits unlawful searches and seizure.

So far as relevant, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. In order to state a claim under this statute, "a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law." Harbin-Bey v. Rutter, 420 F.3d 571, 574 (6th Cir. 2005).

Plaintiff's Section 1983 claim was added by Plaintiff's Amended Complaint filed January 13, 2014. Because Section 1983 has a one-year statute of limitation in Tennessee, Hughes v. Vanderbilt Univ., 215 F.3d 543, 547 (6th Cir. 2000), Defendants argue that the only cognizable claim is that related to Dr. Semmes' failure to forward immediately Plaintiff's 2014 emails about alleged retaliation to the Office of Diversity and Legal Affairs. In response, Plaintiff argues that all of her claims are cognizable under the "Doctrine of 'Relation Back.'" (Docket No. 37 at 25).

Assuming that Plaintiff's Section 1983 claim "relates back to August 27, 2014, the date of the original Complaint," id., they are subject to dismissal for at number of reasons. First, insofar a Plaintiff claims she was denied equal protection, that fails for the reasons set forth above because "[t]he elements for establishing an Equal Protection claim under § 1983 and the elements for establishing a violation of Title VII disparate treatment claim are the same." Deleon v. Kalamazoo Cnty. Road Comm'n, 739 F.3d 914, 918-19 (6th Cir. 2014).

Second, insofar as Plaintiff is alleging First Amendment retaliation, that claim fails because it requires showing an "adverse employment action," but the Court has previously found that she

has not established the lesser "materially adverse action" standard required for Title VII cases. See, Laster, 746 F.3d at 718 (stating that "the type of activity protected by the First Amendment is different than the type of activity protected by Title VII," and the "'materially adverse action' element of a Title VII retaliation claim is substantially different from the 'adverse employment action' element of a Title VII" claim). Third, insofar as Plaintiff may be asserting the denial of due process, she has not shown the deprivation of a property or liberty interest which is essential to such a claim. Wershe v. Combs, 763 F.3d 500, 506 (6th Cir. 2014). Fourth, regardless of the basis of the claim, Defendants have asserted the defense of qualified immunity which shields governmental officials from liability for conduct which does not violate a clear established constitutional statutory right, Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), and Plaintiff has not carried her " burden to prove that the state officials are not entitled to qualified immunity," Ciminillo v. Streicher, 434 F.3d 461, 466 (6th Cir. 2006), by showing that she was deprived of a clearly established right. Everson v Leis, 556 F.3d 484, 494 (6th Cir. 2009).

### III.  Conclusion

On the basis of the foregoing, Defendants' Motion for Summary Judgment will be granted, and this case will be dismissed.

An appropriate Order will be entered.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE